UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Case No.  16-mc-80206-KAW

IN RE PETITION OF JENNIFER
GRANICK AND RIANA PFEFFERKORN

**REPORT AND RECOMMENDATION
TO DENY PETITION; ORDER
REASSIGNING CASE TO A DISTRICT
JUDGE**

Re: Dkt. No. 1

On September 28, 2016, Petitioners Jennifer Granick and Riana Pfefferkorn filed a petition
to unseal technical assistance orders and materials, including all applications, motions, opposition
briefs, orders, and/or warrants filed under the Wiretap Act, the Stored Communications Act, the
Pen Register Act, and/or the All Writs Act.  (Petition at 1, Dkt. No. 1.)  For the reasons stated
below, the Court RECOMMENDS that the petition be denied, and REASSIGNS the case to the
Honorable Chief Judge Phyllis J. Hamilton.

## I.     BACKGROUND

### A.     Petition and Relief Sought

Petitioners are researchers, seeking the unsealing of particular court records related to
"how government agents are using legal authorities to compel companies to assist them in
decrypting or otherwise accessing private data subject to surveillance orders."  (Petition at 1.)
Specifically, Petitioners request that:

(1)     the Court assign case numbers to, and docket in its Case Management/Electronic
Case Filing system ("ECF") all applications, motions, opposition briefs, orders, and/or warrants
filed under the Wiretap Act, the Stored Communications Act ("SCA"), the Pen Register Act
("PRA"), and the All Writs Act ("AWA");

1    (2)    the Court unseal and make publicly available docket sheets for the above-listed

2    surveillance matters;

3    (3)    the documents in the docket sheets for the above-listed surveillance matters if

4    related to technical assistance, filed from January 1, 2006 through six months prior to the granting

5    of the Petition, be unsealed and made publicly available if falling under the statutory provisions:

6    - 18 U.S.C. § 2511(2)(a)(ii) or § 2518(4) of the Wiretap Act,

7    - 18 U.S.C. § 2703 of the SCA,

8    - 18 U.S.C. § 3123(b)(2) or § 3124(a)-(b) of the PRA, and/or

9    - 28 U.S.C. § 1651(a) of the AWA; and

10    (4)    the Court revise its docketing practices such that the Clerk's Office will assign case

11    numbers to, docket, and enter into ECF all applications and orders for search warrants,

12    surveillance, and technical assistance; the Court will undertake a periodic review of sealed

13    dockets, warrants, surveillance orders, and technical assistance orders; and that the Court will

14    unseal records for records for which there is no longer any need for continued sealing.

15    (Petition at 2.)

16    Petitioners assert that the relief sought is warranted because the public has both a First

17    Amendment and common law right of access to the documents sought.  (Pets.' Memorandum ISO

18    Pet. at 11-13, Dkt. No. 2.)  After Petitioners filed the instant miscellaneous action, the United

19    States filed a statement of interest, requesting an opportunity to appear before the Court granted

20    any relief.  (Dkt. No. 6.)

21    **B.    Northern District of California's Current Docketing and Sealing Procedures**

22    Currently, the Northern District creates docket sheets for all of the matters sought by

23    Petitioners, treating them as criminal miscellaneous cases.  Unlike civil docket sheets, however,

24    criminal miscellaneous cases do not include the actual documents at issue, *i.e.*, .pdf files attached

25    to each of the docket entries.  Furthermore, at present, there is no uniform way for how

26    information is entered onto the criminal miscellaneous docket sheets, nor does the docket sheet

27    necessarily identify the type of criminal matter.  The cases are often sealed, such that there is no

28    way for the public to search the fully sealed cases on PACER.  If, however, an individual learned

United States District Court
Northern District of California

2

the case number, they would only get a message that the case is under seal, and they would not be able to open the docket.

Because there is no uniform way for how information is entered, there is currently no accurate way for searching all criminal miscellaneous cases of a certain type, such as all PRA or SCA matters.  While some searches can be performed, they are likely to be under inclusive because there is no standard way to title the cases.

### C.    Procedural History

#### i.    Motion to Unseal

On January 12, 2017, Petitioners filed a motion to unseal and make publicly accessible in ECF the docket sheets for all criminal miscellaneous matters filed in this district from 2006 to 2011.  (Dkt. No. 8 at 1.)  The motion also sought to require the Clerk to enter into ECF and make publicly accessible all records in criminal miscellaneous cases filed from 2006 to 2011 that had been unsealed, as contained in an attached list.  (*Id.*)  The government and petitioners filed opposition and reply briefs, as well as supplemental briefs at the Court's request.  (Dkt. Nos. 15, 23, 27, 28.)  The Court held oral arguments on May 4, 2017.  (Dkt. No. 29.)

On June 23, 2017, the Court denied Petitioners' motion to unseal.  The Court agreed that in general, "there is a qualified constitutional right to access court records,"[1] but raised concerns that "the scope of the relief sought by Petitioners is overbroad."  (Ord. Denying Mot. to Seal at 2, Dkt. No. 36.)  The Court noted that Petitioners were assuming that because the docket sheets they sought to have unsealed were over five years old, there would be no harm to a protected interest by unsealing all of the miscellaneous criminal matters.  Likewise, Petitioners assumed that all documents in the unsealed cases could be docketed without considering whether the cases were unsealed for limited purposes or subject to protective orders.  "Neither assumption[, however wa]s tenable."  (*Id.*)  Rather, the Court explained that investigations can be ongoing after five years, and that even when an investigation was closed, unindicted targets would have a privacy interest in not having their information revealed.  Thus, "Petitioners' request for wholesale unsealing is not

---

[1] The Court did not state that Petitioners had a qualified constitutional right to the court records at issue in this case.

United States District Court
Northern District of California

1    practicable, as each case needs to be evaluated on an individual basis to ensure that unsealing is

2    permissible.  Otherwise, there is an undue risk that information which should be sealed, whether

3    because it is required by statute or to protect ongoing investigations or privacy interests, will be

4    improperly released." (*Id.* at 2-3.)  The Court also observed that "the relief sought by Petitioners

5    requires that this Court reverse the sealing orders of other judges in this district, which this Court

6    lacks the authority to do." (*Id.* at 3.)  Thus, based on the broad scope of the relief sought, the

7    Court denied the motion to unseal. (*Id.*)

8         On September 13, 2017, the Court set a status conference to discuss next steps.  (Dkt. No.

9    41.)  After Petitioners filed supplemental information, the Court continued the case management

10   conference.  (Dkt. No. 45.)

11        ii.    ***In re Leopold***

12        During this time, *In re Leopold*, Case No. 13-mc-712-BAH -- a similar petition to unseal --

13   was making its way through the District of Columbia district court.  There, the petitioners sought

14   "to unseal almost twenty years of sealed government applications, and related orders, to obtain

15   information about, and the contents of, electronic communications in criminal investigations now

16   closed." *In re Application of Jason Leopold to Unseal Certain Elec. Surveillance Applications &*

17   *Orders (In re Leopold I)*, 300 F. Supp. 3d 61, 67 (D.D.C. 2018).  After months of collaboration

18   between the petitioners, the United States, and the D.C. Clerk's Office, the court released: (1) a list

19   of 2,248 PR/TT matters initiated by the United States Attorney's Office ("USAO") between 2008

20   and 2016, including limited docket entry information (matter caption, dates of the application's

21   filing and entry onto the docket, the application's caption, and the application's ECF case type); (2)

22   the total approximate number of SCA § 2703(d) matters and SCA warrant materials filed between

23   2008 and 2016; (3) redacted copies of four pen register/trap and trace ("PR/TT") matters,

24   amounting to 127 pages; and (4) the extraction of fifteen specific categories of information from

25   24 PR/TT matters filed by the USAO in 2012 (a 10% sample), including the case name, docket

26   number, date executed, date docketed, whether it was an original application or an extension,

27   whether there was an opinion, number of pages, the signing attorney or magistrate judge, device

28   type, statutory violation(s), agency, service provider, number of target e-mail addresses/phone

numbers, other statutory authority, and other requests.  *Id.* at 73-79.

The USAO and the D.C. Clerk's Office also entered into a memorandum of understanding ("MOU"), which required standardized case captions for sealed applications and orders.  *In re Leopold*, 300 F. Supp. 3d at 104.  While the standardized case caption would not include personally identifying information, it would contain information about the number of targeted accounts, the service provider, and the primary offense statute applicable to the activity being investigated.  *Id.*  Using the standardized case captions, the D.C. Clerk's Office could periodically generate publicly accessible reports through ECF, showing the total number, matter docket numbers, and case captions associated with sealed matters, without requiring further redactions. *Id.*  The D.C. Clerk's Office would also adopt new ECF case types to more readily identify the type of investigative matter being initiated; instead of using the general "MC" number, "PR" would be used for PR/TT applications while "SC" would be used for SCA applications.  *Id.* at 105.

The parties were then unable to come to further agreement, and on February 26, 2018, the district court issued an order on the pending petition.  *See In re Leopold*, 300 F. Supp. 3d at 79.  In its order, the *Leopold* court concluded that there was no First Amendment right of access to SCA warrants, § 2703(d) applications and orders, and PR/TT materials.  *Id.* at 91.  Next, the district court found that there was a common law right of access to prospective relief, limited to the information that would be provided by the USAO and D.C. Clerk's Office MOU.  *Id.* at 97.  The district court found there was no common law right of access to additional prospective relief, such as real-time unsealing and public posting on PACER of each matter's case number, case name, date of application, and assigned magistrate judge.  *Id.* at 105-06.  The district court also found no common law right of access to require that the government initiating the sealed matter promptly move to unseal or partially unseal upon the close of the criminal investigation, or to require that the court issue an order to show cause within six months of the initial filing.  *Id.* at 106.  Finally, the district court concluded there was no common law right of access to additional retrospective relief, such as further extraction of information from PR/TT matters filed between 2008 through 2016 or producing lists of § 2703(d) matter docket information for the same nine-year period.  *Id.* at 97-99.

United States District Court
Northern District of California

### iii.    Post-*Leopold* Actions

On March 12, 2018, the Court ordered the parties to file supplemental briefing, asking the parties to explain how, if at all, their positions had changed in light of the *In re Leopold* decision. (Dkt. No. 48.)  The Court also continued the case management conference.  On March 26, 2018, the parties filed their supplemental briefs.  (Dkt. Nos. 49-50).  On May 1, 2018, the Court issued another supplemental briefing order, noting that *In re Index Newspapers LLC*, Case No. 17-mc-145-RSL (W.D. Wash.) -- another petition seeking to unseal similar documents -- had been filed. (Dkt. No. 52 at 1.)  The Court noted that the Government's response in *In re Index Newspapers LLC* raised many of the concerns that the Court had with the instant petition, including whether petitioners were seeking structural reforms that were distinguishable from the Court's general supervisory power over its records, whether the logic prong would apply to the documents sought, and whether there was a separate right of access to dockets where the dockets at issue were on matters that were sealed.  (*Id.*)  The Court ordered Plaintiffs to file a supplemental brief on why the petition should not be denied for the reasons stated in the Government's response in *In re Index Newspapers*, and again continued the case management conference.  (*Id.* at 2.)

On May 15, 2018, Petitioners filed a motion for leave to file a motion for reconsideration, on the ground that they had already briefed the issues required by the Court.  (Dkt. No. 53 at 3.) Petitioners also noted that the Northern District's Criminal Rules and Procedures Committee intended to create a subcommittee to consider reforms to the Northern District's docketing procedures for surveillance matters.  (*Id.*)

On June 1, 2018, the Court denied Petitioners' motion for leave, but terminated the briefing schedule set in its May 1, 2018 order.  (Dkt. No. 54 at 1.)  The Court stated it would instead likely issue a report and recommendation and order that the case be reassigned to a district judge.  (*Id.*)

## II.    LEGAL STANDARD

As a general matter, "there is no right of access which attaches to all judicial proceedings, even all criminal proceedings."  *Phoenix Newspapers, Inc. v. U.S. Dist. Court for Dist. of Ariz.*, 156 F.3d 940, 946 (9th Cir. 1998).  The law, however, "recognizes two qualified rights of access to judicial proceedings and records, a common law right to inspect and copy public records and

documents, including judicial records and documents, and a First Amendment right of access to criminal proceedings and documents therein." *United States v. Bus. of Custer Battlefield Museum & Store*, 658 F.3d 1188, 1192 (9th Cir. 2011) (internal quotation omitted).

### A.     First Amendment Right of Access

Under the First Amendment, "[c]ourts are required to examine whether 1) historical experience counsels in favor of recognizing a qualified First Amendment right of access to the proceeding and 2) whether public access would play a significant positive role in the functioning of the particular process in question." *Times Mirror Co. v. United States*, 873 F.2d 1210, 1213 (9th Cir. 1989) (internal quotation omitted).  Generally, "[i]f a proceeding fulfills both parts of the test, a qualified First Amendment right of access arises . . . ." *Phoenix Newspapers, Inc.*, 156 F.3d at 946.  The Ninth Circuit has, however, found that in some circumstances, "logic alone, even without experience, may be enough to establish the right." *In re Copley Press, Inc.*, 518 F.3d 1022, 1026 (9th Cir. 2008).

If a qualified First Amendment right exists, it can be "overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Phoenix Newspapers, Inc.*, 156 F.3d at 946 (internal quotation omitted).  The court "must articulate this interest along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Id.* at 946-47 (internal quotation omitted).  Thus, closure is permitted only where: "(1) closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest." *Id.* at 949.

### B.     Common Law Right of Access

"The Supreme Court has recognized that the public has a right, founded in the common law, to inspect and copy *public* records and documents, including judicial records and documents." *Times Mirror Co.*, 873 F.2d at 1218 (internal quotation omitted).  This "right to inspect and copy judicial records is not absolute." *Nixon v. Warner Commc'ns Inc.*, 435 U.S. 589, 598 (1978).  Instead, "the common-law right is not of constitution dimension, is not absolute, and is not entitled

United States District Court
Northern District of California

to the same level of protection afforded constitutional rights." *Valley Broad. Co. v. U.S. Dist. Court for Dist. of Nev.*, 798 F.2d 1289, 1293 (9th Cir. 1986).  Thus, the Ninth Circuit has not "recognized a common law right of access to judicial records where there is neither a history of access nor an important public need justifying access." *Times Mirror Co.*, 873 F.2d at 1219.

## III.    DISCUSSION

### A.    Retrospective Relief

#### i.    First Amendment Right of Access

##### a.   Wiretap Act

The Wiretap Act "is designed to prohibit all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officials engaged in investigation of specified types of major crimes." *Greenfield v. Kootenai Cty.*, 752 F.2d 1387, 1388 (9th Cir. 1985) (internal quotation omitted).  A judge may enter an ex parte order approving interception of wire, oral, or electronic communications if the judge determines that there is probable cause to believe that the particular communication to be intercepted will reveal evidence of a predicate felony offense.  *See* 18 U.S.C. §§ 2518(3)(a)-(b).  The order shall specify the identity of the person whose communications are to be intercepted, the nature and location of the communication facilities as to which authority to intercept is granted, a description of the type of communication sought to be intercepted, the particular offense to which it relates, the agency authorized to intercept the communications, and the period of time during which such interception is authorized.  18 U.S.C. § 2518(4).  The Wiretap Act also allows providers of wire or electronic communication services to provide technical assistance to persons authorized by the law to intercept such communications if given a court order directing such assistance or a court order pursuant to the Foreign Intelligence Surveillance Act.

The Wiretap Act requires that the "[a]pplications made and orders granted under this chapter shall be sealed by the judge." 18 U.S.C. § 2518(8)(b).  Moreover, "[s]uch applications and orders shall be disclosed only upon a showing of good cause before a judge of competent jurisdiction . . . ." *Id.*  The Second Circuit has concluded that good cause only exists where the applicant seeking to unseal the wiretap applications and orders is an "aggrieved person," which is

1    defined by 18 U.S.C. § 2510(11) as "a party to any intercepted wire or oral communication or a

2    person against whom the interception was directed." *Nat'l Broad. Co. v. U.S. Dep't of Justice*, 735

3    F.2d 51, 55 (2d Cir. 1984) (*NBC*).  In so finding, the Second Circuit explained that the Wiretap

4    Act was enacted in recognition that wiretapping could be highly intrusive of privacy, such that

5    "'although [the Wiretap Act] authorizes invasions of individual privacy under individual

6    circumstances, the protection of privacy was an overriding congressional concern.'"  *Id.* at 53

7    (quoting *Gelbard v. United States*, 408 U.S. 41, 48 (1972)).  With such privacy interests in mind,

8    to turn the statute "into a general civil discovery mechanism would simply ignore the privacy

9    rights of those whose conversations are overheard."  *Id.* at 54.

10          Petitioners argue that there is a First Amendment right of access to wiretap materials.

11   (Pets.' Memorandum ISO Pet. at 24-25.)  The Ninth Circuit has not determined whether the First

12   Amendment requires disclosure of wiretap applications and orders.  In *In re New York Times Co.*,

13   however, the Second Circuit concluded that there was no First Amendment right to such

14   documents.  577 F.3d 401, 409 (2d Cir. 2009).  First, the Second Circuit concluded that there was

15   no history of access because wiretap applications were not created until 1968, and that "since the

16   time of their creation . . . , have been subject to a statutory presumption *against* disclosure."  *Id.* at

17   410.  Thus, "wiretap applications have not historically been open to the press and general public."

18   *Id.*  Second, the Court of Appeals found that the plaintiff had failed to "present a good reason why

19   its preferred public policy ('logic')--monitoring the government's use of wiretaps and potential

20   prosecutions of public officials--is more compelling than Congress's preferred policy of favoring

21   confidentiality and privacy . . . ."  *Id.*  Thus, neither the history nor logic prongs supported a First

22   Amendment right to disclosure.  *Id.*

23          Similarly, in *United States v. Blagojevich*, the district court concluded that there was "no

24   historical tradition of open public access to [Wiretap Act] materials."  662 F. Supp. 2d 998, 1004

25   (N.D. Ill. 2009).  Rather, disclosure of such "materials is permissible only under limited

26   circumstances and the authority to disclose extends only to materials obtained in accordance with

27   [the Wiretap Act's] provisions."  *Id.*  Thus, "'the only lawful way that the materials presently under

28   seal can be made public under [the Wiretap Act] is by being admitted into evidence at a criminal

United States District Court
Northern District of California

9

1   trial or at a suppression hearing, events which have yet to occur.'" *Id.* (quoting *United States v.*

2   *Inzunza*, 303 F. Supp. 2d 1041, 1046 (S.D. Cal. 2004).  The *Blagojevich* court also found that

3   under the logic prong, the plaintiffs failed to "offer good reasons why public policy related to

4   accountability, the fair administration of justice, or the dissemination of news about high-profile

5   public corruption charges is more compelling than Congress' apparent concern for confidentiality

6   and privacy."  *Id.* (internal quotation omitted).

7         Here, Petitioners do not argue that there is historical right of access.  Instead, Petitioners

8   argue only that logic favors unsealing because unsealing would "enable the public to understand

9   whether the Wiretap Act allows the government to force private parties to help it access encrypted

10  communications at a time of contentious public debate over the propriety of such compulsion."

11  (Pets.' Memorandum ISO Pet. at 24.)  Further, "[i]t would also help the public understand whether

12  the law allows investigators to turn on the cameras or microphones in consumer goods like

13  televisions, smartphones, and computerized home assistants to conduct surveillance."  (*Id.*)

14  Petitioners also contend that the Second Circuit's concerns in *In re New York Times* are not at issue

15  because technical assistance applications are distinguishable from wiretap applications, and that

16  disclosure of technical assistance applications and orders would not implicate the confidentiality

17  and privacy interests codified in the Wiretap Act.  (*Id.* at 25.)

18        The Court finds *In re New York Times* persuasive.  In establishing the Wiretap Act,

19  Congress placed significant limits on the use of and access to wiretaps and wiretap applications

20  themselves, in order "to tightly control the use of this prosecutorial tool and to safeguard the

21  privacy interests of those subjected to a wiretap."  *In re United States*, 10 F.3d 931, 934 (2d Cir.

22  1993).  For example, wiretap applications must be authorized by the Attorney General or her

23  designees, and are limited to seeking evidence for specifically enumerated offenses.  *See* 18

24  U.S.C. § 2516(1).  Further, the Wiretap Act "grants the power to approve wiretaps only to federal

25  Article III judges and state judges having general criminal jurisdiction and state statutory

26  authorization," such that even the undersigned could not approve such an application.  *In re United*

27  *States*, 10 F.3d at 936 (citing 18 U.S.C. § 2510(9)); *see also United States v. Duran*, Crim. No. 15-

28  4512 MV, 2017 WL 3052524, at *9 (D.N.M. June 20, 2017) ("only Article III judges are

United States District Court
Northern District of California

10

permitted to issue warrants for wiretaps").  Such strict limitations highlight Congress's concerns for confidentiality and privacy in disclosing wiretap materials.

The Court disagrees with Petitioners that *In re New York Times* is distinguishable because they seek technical assistance applications.  A technical assistance application is a type of wiretap application, and in discussing wiretap applications in general, the Second Circuit did not separate out technical assistance applications as being subject to a different standard.  Notably, Petitioners themselves do not explain why technical assistance applications should be treated differently from wiretap applications in general, or why they do not implicate the same privacy or confidentiality concerns at issue with all wiretap applications.  While Petitioners contend that the investigations are finished, and that Petitioners do not seek identifying information, that does not distinguish technical assistance applications from all other wiretap applications, such that they should be entitled to fewer protections.  Thus, the Court finds that like the plaintiffs in *In re New York Times* and *Blagojevich*, Petitioners have failed to explain why their preferred public policy outweighs Congress's stated interests.

Given these concerns, and Petitioners' failure to explain why their preferred public policy outweighs Congress's preferred policies protecting privacy and confidentiality, the Court concludes that Plaintiff has not established a First Amendment right to technical assistance orders under the Wiretap Act.

b.   Stored Communications Act

The SCA "regulates . . . the government's access to stored wire and electronic communications."  *In re Leopold I*, 300 F. Supp. 3d 61, 84 (D.D.C. 2018).  Title 18 U.S.C. § 2703 "permits the government, in specified circumstances, to compel service providers to disclose records or information pertaining to their customers as well as the contents of their customers' stored electronic communications."  *Id.* (internal quotation omitted).

"[T]he SCA contains no provision requiring the sealing of SCA warrants or § 2703(d) orders and applications in support thereof."  *In re Leopold I*, 300 F. Supp. 3d at 85.  The SCA, however, "explicitly relieves the government of any obligation to notify a subscriber or customer about the compelled disclosure pursuant to an SCA warrant, and authorizes delayed notification to

the subscriber of compelled disclosure pursuant to a § 2703(d) order." *Id.* (internal citation

omitted); *see also* 18 U.S.C. §§ 2703(c), 2705(a).  The SCA also permits the government to seek a

non-disclosure order preventing the service provider from disclosing to the subscriber for a period

of time that the government had compelled disclosure of the records.  18 U.S.C. § 2705(b).

Petitioners assert that there is a First Amendment right of access to SCA documents.

(Pets.' Memorandum ISO Pet. at 18.)  Petitioners concede that "there is no historical tradition of

access to SCA documents," but argue that there is a First Amendment right under the logic prong.

(*Id.*)  Again, the Ninth Circuit has not determined whether there is a First Amendment right of

access to SCA documents.  The Fourth Circuit, however, has specifically concluded that the logic

prong does not support a First Amendment right of access.  *In re Application of the United States*

*of Am. for an Order pursuant to 18 U.S.C. § 2703(d) (In re Appelbaum)*, 707 F.3d 283, 291-92

(4th Cir. 2013).  The Fourth Circuit explained that "[t]he logic prong asks whether public access

plays a significant role in the process in question," but that the SCA "process is investigative, and

openness of the orders does not play a significant role in the functioning of investigations."  *Id.* at

292.  Specifically, SCA "proceedings consist of the issuance of and compliance with [SCA]

orders, are *ex parte* in nature, and occur at the investigative, pre-grand jury, pre-indictment phase

of what may or may not mature into an indictment." *Id.*  Such "[p]re-indictment investigative

processes where privacy and secrecy are the norm are not amenable to the practices and

procedures employed in connection with other judicial proceedings." *Id.* (internal quotation

omitted).

In finding no First Amendment right of access to SCA materials, the Fourth Circuit

rejected the challengers' argument that transparency of SCA motions and orders "would ensure

fairness, decrease bias, improve public perception of the justice system, and enhance the chances

that the orders are well-justified and not overbroad." *In re Appelbaum*, 707 F.3d at 292 (internal

quotation omitted).  Instead, the Fourth Circuit pointed out that the Supreme Court had previously

found that "'[a]lthough many governmental processes best operate under public scrutiny, it takes

little imagination to recognize that there are some kinds of government operations that would be

totally frustrated if conducted openly.'" *Id.* (quoting *Press-Enterprise Co. v. Superior Court*, 478

U.S. 1, 8-9 (1986)).  Thus, "[b]ecause secrecy is necessary for the proper functioning of the criminal investigations at this [SCA] phase, openness will frustrate the government's operations." *Id.*

Petitioners argue that *In re Appelbaum* is distinguishable because it occurred as the pre-indictment stage, whereas Petitioners are seeking the SCA materials after the investigations have concluded.  (Pets.' Memorandum ISO Pet. at 19.)  At the post-investigation stage, Petitioners contend that courts in this Circuit have found that there is a First Amendment right of access to search warrants, and SCA materials should be treated the same as search warrants.  (*Id.* (citing *United States v. Loughner*, 769 F. Supp. 2d 1188, 1194 (D. Ariz. 2011) ("When there is no danger of corrupting the investigation or interfering with grand jury proceedings, opening search warrant materials to public inspection can play a significant positive role in the functioning of the criminal justice system.")).)  The Court disagrees on both points.

First, although *In re Appelbaum* is a pre-indictment case, the Fourth Circuit did not find there was no First Amendment right because the challengers sought to unseal the documents during the ongoing investigation.  Rather, the Fourth Circuit focused on the fact that the SCA materials were themselves investigative because they were applied for at the investigative, pre-indictment phase.  *In re Appelbaum*, 707 F.3d at 292.  Because the materials were pre-indictment investigative processes, they were not amenable to unsealing.  *Id.*  Moreover, even at the post-investigation stage, the Court notes that "[p]ublic access also could compromise future investigations by revealing the existence or workings of 'investigative methods and techniques, the very efficacy of which may rely, in large part, on the public's lack of awareness that the USAO employs them." *In re Application of Jason Leopold to Unseal Certain Electronic Surveillance Applications & Orders (In re Leopold II)*, 327 F. Supp. 3d 1, 19 (D.D.C. 2018) (internal quotation omitted).

Second, the Court does not agree that SCA materials should be treated similarly to search warrants.  In *In re Leopold I*, the district court concluded that "[a]n SCA warrant, though a warrant in name, is more analogous to a subpoena than to a traditional search warrant."  300 F. Supp. 3d at 89.  The D.C. district court explained that warrants were "a judicial authorization to a law

enforcement officer to search or seize persons or things." *Id.* at 88 (internal quotation omitted). Warrants were issued without prior notice, and executed "with an unannounced and unanticipated physical intrusion." *Id.* (internal quotation omitted). Further, the target had no opportunity to challenge the search warrant before the warrant issued. *Id.* Thus, search warrants required an "intrusion that is both an immediate and substantial invasion of privacy." *Id.* (internal quotation omitted). In contrast, "[w]hereas a search warrant entitles government agents to inspect and/or rifle through targets' persons, houses, papers, and effects, a subpoena instead directs a target to 'comply' with a 'demand' for information." *In re Leopold*, 300 F. Supp. 3d at 89 (internal quotation omitted). The subpoena also "commences an adversary process during which the person served with the subpoena may challenge it in court before complying, meaning that judicial process is afforded before any intrusion occurs." *Id.* (internal quotation omitted). Thus, the subpoena did not subject targets to "the immediacy and intrusiveness of a search and seizure conducted pursuant to a warrant." *Id.* (internal quotation omitted).

The *Leopold* court also found that SCA warrants were more similar to subpoenas than search warrants as to method of execution because "an SCA warrant does not authorize the government to search and size 'persons or things,' in a search warrant's manner, but rather requires a provider's 'disclosure of the contents of certain communications,' in a subpoena's manner." *In re Leopold*, 300 F. Supp. 3d at 89 (quoting 18 U.S.C. § 2703(a)). The district court also found that there was an *ex ante* opportunity to challenge the compelled disclosure because a recipient of the SCA warrant could move to quash it. *Id.* Further, the recipient "need not disclose any information sought until the adversary process completes." *Id.* This was distinguishable from search warrants, which "generally provides the target neither prior notice of the search and/or seizure nor *ex ante* opportunity to quash."[2] *Id.* Additionally, the district court found that § 2703(d) orders were even

---

[2] On reconsideration, the district court acknowledged that as a practical matter, the target of the SCA warrant would typically not have the opportunity to challenge the SCA warrant. *In re Leopold II*, 327 F. Supp. 3d at 13. The district court noted, however, that "while a target typically will be unable to move to quash an SCA warrant prior to execution, the provider to whom the SCA warrant is directed has an incentive to move to quash an apparently defective SCA warrant-- namely, to avoid the risk of civil liability--and thereby stands somewhat in the target's shoes to vindicate the target's interests in ensuring a valid SCA warrant." *Id.* at 14-15. Thus, "[t]he existence of an actor--the provider to whom an SCA warrant is directed--with both the opportunity

14

1   less analogous to search warrants because issuance of a § 2703(d) order did not require

2   compliance with Rule 41's procedures of "probable cause" standard.  *Id.* at 91.

3         On reconsideration, the district court further explained that in contrast to the traditional

4   search warrant, SCA warrants also provided for less public disclosure of government collection of

5   information because traditional search warrants "require[d] that the warrant and receipt for

6   property taken be left with the person from whom, or from whose premises, the property was

7   taken." *In re Leopold II*, 327 F. Supp. 3d at 11 (internal quotation omitted).  In contrast, the SCA

8   permits the government to preclude the service provider from informing its customer about the

9   SCA warrant's very existence.  In other words, "[a] person subject to a search and seizure pursuant

10  to a traditional search warrant is entitled to be notified of such search and seizure, while a person

11  whose information the government obtains through an SCA warrant is not entitled to know the

12  government has obtained such information." *Id.*  Thus, the district court concluded that by

13  providing less public disclosure under the SCA than applied to traditional search warrants,

14  Congress did not intend to treat SCA warrants like traditional search warrants.  *Id.*

15        The Court agrees with the *Leopold* court's reasoning that SCA warrants are more akin to

16  subpoenas, "to which no recognized First Amendment right of access attaches, than to traditional

17  search warrants." *In re Leopold II*, 327 F. Supp. 3d at 8.  Thus, to the extent Petitioners rely on

18  cases that concern First Amendment access to traditional search warrant materials at the post-

19  investigative stage, such cases are distinguishable.[3]  Instead, the Court finds more persuasive *In re

20  Appelbaum* and *In re Leopold II*'s findings that the logic prong does not support the disclosure of

21  SCA documents, as public access to such records may "compromise future investigations . . . ." *In

22  re Leopold II*, 327 F. Supp. 3d at 19.  The Court therefore concludes that there is no First

23  Amendment right to unsealing the technical assistance orders under the SCA.

24

25  to move to quash a seemingly-deficient SCA warrant and incentives to do so makes an SCA
26  warrant more akin to a subpoena rather than to a traditional search warrant . . . ." *Id.* at 15.
    [3] Petitioners argue in a footnote that the *Leopold* court's discussion about whether SCA warrants
27  are comparable to search warrants or subpoenas was in the context of the First Amendment's
    experience prong, not the logic prong.  (Dkt. No. 49 at 9 n.5.)  Petitioners fail, however, to explain
28  why this analysis would differ under the logic prong, and the Court sees no reason to distinguish
    *Leopold* on this basis.

c.   Pen Register Act

The PRA allows the government to apply "for an order or an extension of an order . . . authorizing or approving the installation and use of a pen register or a trap and trace device under this chapter . . . ."  18 U.S.C. § 3122(a).  "PR/TT are devices or processes that record outgoing and incoming signals from an instrument or facility that transmits or receives an 'electronic communication,' and can be used to identify the source or recipient of that communication, albeit not the contents of that communication."  *In re Leopold I*, 300 F. Supp. 3d at 82-83 (internal quotation omitted).  Orders issued under PRA § 3123(b) "shall direct, upon the request of the applicant, the furnishing of information, facilities, and technical assistance necessary to accomplish the installation of the" PR/TT device.  18 U.S.C. § 3123(b)(2).  PRA § 3124 also requires that providers of wire or electronic communication services shall furnish the government with the technical assistance necessary to install the PR/TT devices.  18 U.S.C. §§ 3124(a)-(b).

Unlike the SCA, the PRA states that the order authorizing or approving the installation and use of the PR/TT device shall direct that "the order be sealed until otherwise ordered by the court." 18 U.S.C. § 3123(d)(1).  The order must also direct the person who owns or leases the line or other facility to which the PR/TT device is attached or applied, or who is required to provide assistance, "not [to] disclose the existence of the [PR/TT] device or the existence of the investigation to the listed subscriber, or to any other person, unless or until otherwise ordered by the court."  18 U.S.C. § 3123(d)(2).

Petitioners argue there is a First Amendment right to PR/TT materials under both the experience and logic prongs.  (Pets.' Memorandum ISO Pet. at 20.)  Specifically, Petitioners contend that "[p]en register orders serve the same purpose as search warrants in the judicial system."  (*Id.*)  Again, the Court disagrees.

The *Leopold* court explained that "PR/TT orders are even less analogous to traditional search warrants than are SCA warrants, differing in both execution and applicable legal standard." *In re Leopold I*, 300 F. Supp. 3d at 91.  Like the SCA order, "[a] PR/TT order . . . does not authorize government agents physically to search or seize persons or things in the manner of a search warrant, although such orders authorize the government physically to install a PR/TT

United States District Court
Northern District of California

1    device at a telephone line or other facility." *Id.* (internal quotations omitted).  The PR/TT order

2    also differed from traditional search warrants because "the showing required for issuance of a

3    PR/TT order is mere relevance to an ongoing criminal investigation." *Id.* (internal quotation

4    omitted).  On this basis, the district court concluded that there was no historic tradition of

5    openness as to PR/TT materials.  *Id.*

6         The *Leopold* court also found the logic prong did not support greater First Amendment

7    access than what the district court had already made available (*i.e.*, the limited docket entry

8    information for 2,248 PR/TT applications, 127 redacted pages from four PR/TT matters, and 15

9    categories of information for 24 PR/TT matters) explaining that there was a need for secrecy

10   during the course of ongoing investigations.  *In re Leopold II*, 327 F. Supp. 3d at 19.  As to the

11   post-investigation phase, again, the district court explained that "[p]ublic access also could

12   compromise future investigations by revealing the existence or workings of investigative methods

13   and techniques, the very efficacy of which may rely, in large part, on the public's lack of

14   awareness that the USAO employs them." *Id.* (internal quotation omitted).  The district court

15   found that its conclusion was confirmed by Congress's mandate of "public reporting on the use of

16   certain surveillance authorities to facilitate oversight," which were "carefully circumscribed." *Id.*

17   Specific to PR/TT orders, the Attorney General was required to annually report the number of

18   such orders applied for with specific associated information.  *Id.* at 19-20 (citing 18 U.S.C. §§

19   2702(d), 3126).  By mandating certain categories of information concerning the use of such

20   surveillance techniques, Congress "ha[d] voiced its judgment concerning the types of information

21   significant for oversight and for which disclosure serves the public interest." *Id.* at 20.

22        The Court therefore agrees with *Leopold* that neither prong of the First Amendment test is

23   satisfied.

24              d.   All Writs Act

25        The AWA states: "The Supreme Court and all courts established by Act of Congress may

26   issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the

27   usages and principles of law." 28 U.S.C. § 1651(a).  As relevant here, the AWA "permits the

28   district court, in aid of a valid warrant, to order a third party to provide nonburdensome technical

assistance to law enforcement officers." *Plum Creek Lumber Co. v. Hutton*, 608 F.2d 1283, 1289 (9th Cir. 1979).  In recent years, the government has, at times, sought and obtained orders under the AWA compelling smartphone companies to bypass encryption on the companies' devices. *E.g.*, *In re Apple, Inc.*, 149 F. Supp. 3d 341, 346, 374 (E.D.N.Y. 2016) (denying government request to require Apple to help it unlock a specific device under the AWA, and noting that Apple's past practice in at least 70 instances was that it could unlock the phone with a lawful court order).

Petitioners argue that there is a First Amendment right of access to AWA orders and supporting materials because AWA orders are like other court orders, which are publicly available.  (Pets.' Memorandum ISO Mot. at 22.)  The Court agrees with this in principle; Petitioners, however, do not seek just any AWA materials.  Rather, as Petitioners acknowledge, they seek AWA materials issued in furtherance of an underlying warrant or surveillance order, such as a PR/TT order.  (*Id.* at 22-23.)  Thus, Petitioners argue that "since there is a right of access to those underlying documents, it follows logically that there is a right of public access to the related AWA orders as well."  (*Id.* at 23.)  As explained above, however, the First Amendment right of access does not attach to Wiretap Act, SCA, and PRA materials.  Therefore, Petitioners' argument is overbroad, as is the relief sought.

### e.  Docket Sheets

Finally, Petitioners argue that there is a long-standing tradition of public access to docket sheets, supporting a First Amendment right of access.  (Pets.' Memorandum ISO Mot. at 13-14.) In general, courts have recognized a qualified First Amendment right of access to docket sheets, explaining that "docket sheets provide a kind of index to judicial proceedings and documents, and endow the public and press with the capacity to exercise their rights guaranteed by the First Amendment." *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 93 (2d Cir. 2004).  The openness of dockets is necessary to "provide[] effective notice to the public that [a hearing] may occur," and to allow "the press and the public to inspect those documents, such as transcripts, that we have held presumptively open." *Id.* at 93, 94.

The issue here, however, is that the documents Petitioners seek access to are not

presumptively open.  As discussed above, there is no First Amendment right to the Wiretap Act,

SCA, PRA, and the AWA materials sought by Petitioners.  In *In re Appelbaum*, the Fourth Circuit

denied a challenge to the docketing procedures of § 2703(d)  proceedings, explaining:

> there is no First Amendment right of access to § 2703(d) proceedings.  While we agree that the public must ordinarily be given notice and an opportunity to object to sealing of public documents, we have never held, nor has any other federal court determined, that pre-indictment investigative matters such as § 2703(d) orders, pen registers, and wiretaps, which are all akin to grand jury investigations, must be publicly docketed.  We refuse to venture into these uncharted waters, and as such, we refrain from requiring district courts to publicly docket each matter in the § 2703(d) context.

707 F.3d at 295 (internal quotation and citations omitted).  Because the underlying documents

Petitioners seek are not presumptively open, the Court concludes that Petitioners are not entitled to

have public dockets for those applications and orders.

### ii.    Common Law Right of Access

Petitioners also argue that there is a common law right of access to warrant materials, SCA

materials, PRA materials, and AWA materials because they are judicial records.  (*See* Pets.'

Memorandum ISO Pet. at 18, 20, 21, 23.)[4]  As an initial matter, the Court agrees there is a

*presumptive* common law right of access to these materials.  In *In re Appelbaum* and *Leopold I*

respectively, the Fourth Circuit and D.C. district court concluded that SCA and PRA materials

were judicial records, to which the presumptive common law right of access attached.  707 F.3d at

---

[4] Petitioners do not appear to argue that there is a common law right of access to Wiretap Act materials.  (*See* Pets.' Memorandum ISO Pet. at 24-25; *see also* Dkt. No. 49 at 11 (stating that Petitioners had established common law right of access to warrant materials, SCA materials, PRA materials, and AWA materials, but not including Wiretap Act materials).  The Court would, however, find that there is no common law right of access to these materials.

Again, "the public has a right, founded in the common law, to inspect and copy *public* records and documents, including judicial records and documents."  *Times Mirror Co.*, 873 F.2d at 1218 (internal quotation omitted).  No right of access exists, however, as "to documents which have traditionally been kept secret for important policy reasons."  *Id.* at 1219.  As discussed above, Wiretap Act materials are not historically open, but are instead presumptively kept sealed.  *See* 18 U.S.C. § 2518(8)(b); *In re New York Times*, 577 F.3d at 410.  Thus, courts have found that the common law right of access does not apply to Wiretap Act materials because the statute itself requires a factual finding of good cause before unsealing.  *Applications of Kan. City Star*, 666 F.2d 1168, 1176-77 (8th Cir. 1981); *In re New York Times*, 577 F.3d at 405 ("Title IIII . . . supersedes any arguable common law right").

United States District Court
Northern District of California

290-91; 300 F. Supp. 3d at 92.  Both of these courts, however, ultimately concluded that the common law presumption of access was outweighed.  In *In re Appelbaum*, the Fourth Circuit agreed that the challengers' stated public interests, which included the nature and scope of the government's surveillance of internet activities and the extent to which SCA orders were complied with, were outweighed by "the Government's interests in maintaining the secrecy of its investigation, preventing potential subjects from being tipped off, or altering behavior to thwart the Government's ongoing investigation . . . ."  707 F.3d at 293.

In *In re Leopold I*, the petitioners sought certain non-personally identifying docket information -- such as the matter caption, dates of the application's filing and entry onto the docket, the application's caption, and the case type -- for the 2,636 § 2703(d) matters filed between 2008 and 2016.  300 F. Supp. 3d at 74, 97.  The petitioners also sought to require that the USAO extract fifteen categories of information -- including case number, docket number, date executed, date docketed, whether an opinion was filed, device type, statutory violation(s), agency, service, provider, number of targeted accounts, and statutory authority -- for all 2,248 USAO-filed PR/TT matters between 2008 and 2016.  *Id.* at 78, 97.  To determine if there was a common law right of access, the district court applied the D.C. Circuit's *Hubbard* test, which requires the courts to weigh the six factors of: (1) the need for public access to the documents at issue, (2) the extent of prior public access to the documents, (3) whether someone has objected to the disclosure, (4) the strength of any property or privacy interests asserted, (5) the possibility of prejudice to those opposing disclosure, and (6) the purpose for which the documents were introduced.  300 F. Supp. 3d at 81-82.

The district court concluded that the *Hubbard* factors weighed in favor of retrospective access to the PR/TT extracted information and § 2703(d) docket information.  *In re Leopold I*, 300 F. Supp. 3d at 97.  It then found, however, that the factors were not dispositive in light of "the enormous burden that complying with an order granting the retrospective relief sought would impose on the USAO and Clerk's Office."  *Id.* at 98.  Specifically, the district court explained that with respect to the PR/TT matters, it had taken the USAO 8.5 hours to extract the fifteen categories of information from 24 PR/TT matters.  To extract that same information from 2,224

1   additional PR/TT matters would thus take 788 hours, or "nearly 33 days working around the clock

2   nonstop, or nearly twenty 40-hour workweeks.  Complying with such a mandate would divert

3   significant amounts of valuable AUSA time and resources." *Id.*  Likewise, to unseal the over 2,600

4   § 2703(d) matters was not "a trivial clerical task," as "[t]he task of assembling lists of historical §

5   2703(d) matters would require multiple Court and Clerk's Office staff members to scrutinize

6   meticulously every entry of each page of every list released to purge these lists of any information

7   bearing on personal identification or law enforcement investigative concerns." *In re Leopold I*,

8   300 F. Supp. 3d at 98-99.  The district court noted that simply examining and redacting similar

9   lists for PR/TT matters filed between 2012 and 2016 had taken "several Court and Clerk's Office

10  personnel days to complete." *Id.* at 99; *see also id.* at 73-74.

11          The district court acknowledged that the "courts generally do not recognize such burden as

12  a relevant factor in deciding the scope of a common law right of access to judicial records." *In re*

13  *Leopold I*, 300 F. Supp. 3d at 100.  The district court went on to explain, however, that:

14              This . . . is largely due to the fact that litigants ordinarily invoke the
                common law right of access with respect to specific documents, not
15              to whole categories of sealed matters filed over an almost decades-
                long period [citations].  Indeed, the petitioners identify no judicial
16              decision recognizing such a right of access to broad categories of
                sealed materials filed over a period of years, let alone when such
17              sealed materials are quintessentially sensitive because they relate to
                the exercise of statutory authorities to collect evidence in criminal
18              investigations.  Courts thus have had little occasion, in common law
                right of access matters, to grapple with the issue of administrative
19              burden that would attend unsealing and disclosure requests of the
                pending petitions' scope.
20

21  *Id.*  Thus, the district court concluded that granting the petitioners' requested retrospective relief

22  "would be unduly burdensome on the USAO and the Clerk's Office, thereby detracting from other

23  mission-critical responsibilities." *Id.* at 102 (internal quotation omitted).

24          In a motion for reconsideration, the petitioners argued that the *Leopold* court should not

25  have considered administrative burden because it could be asserted in every case where the public

26  sought to unseal documents pursuant to a common law right of access.  *See In re Leopold II*, 327

27  F. Supp. 3d at 24.  While this was true, the district court explained that:

28              the weight a court will assign such concern will correspond to the

21

United States District Court
Northern District of California

> volume of documents a petitioner seeks to unseal. Where petitioners seek to unseal specific documents, the administrative burden that attends unsealing may be slight, and so will not weigh heavily on a court's *Hubbard* analysis. Where, in contrast, petitioners seek to unseal wholesale categories of sealed matters filed over an almost decades-long period, the administrative burden such unsealing will entail appropriately may weigh more heavily in a court's *Hubbard* analysis. . . . Where the type of record sought to be unsealed requires careful review prior to unsealing to ensure that information properly retained under seal is not disclosed, and where the volume of the materials sought be unsealed amplifies the burden that undertaking such review will impose on a party and/or the Court, *Hubbard* properly allows a court to cognize such burden in weighing a motion to unseal.

*Id.* at 24-25 (internal quotations omitted).

The petitioners also argued that allowing the courts to consider administrative burden would shift the burden to the public to determine the right amount of access that a court would deem not to be too administratively burdensome. *In re Leopold II*, 327 F. Supp. 3d at 26. The district court agreed that:

> [t]his does place on the petitioner some responsibility to exercise good judgment in deciding the scope of unsealing to seek, especially where, as here, the judicial records to be unsealed require careful, page-by-page review prior to disclosure to ensure that no information properly left under seal inadvertently is disclosed, so as to protect ongoing investigations and the considerable privacy interests of potential subjects or targets of criminal investigations that may not have resulted in any formal charges. To require a petitioner to contemplate the possibility that an overly-burdensome request for unsealing may be denied does not amount to legal error.

*Id.* at 26-27.

This Court agrees with the *Leopold* court that the administrative burden of Petitioners' requests overcome the presumption of common law access to SCA, PRA, and AWA materials. Here, Petitioners request that the docket sheets for all these matters, as well as Wiretap Act cases, be unsealed and made publicly available, and that all underlying documents filed between January 1, 2006 to six months before the date the Petition is granted be unsealed and made publicly available if related to technical assistance. (Petition at 1-2.) Additionally, it is not clear if Petitioners also continue to request that the court unseal and make publicly accessible all docket sheets in criminal miscellaneous cases filed between 2006 and 2011, as well as enter into ECF and make publicly accessible all records in criminal miscellaneous cases filed from 2006 to 2011 that

22

had been unsealed, with redactions to protect confidentiality if necessary.  (Dkt. No. 8 at 1, 7.)  As the *Leopold* court found, the burden of unsealing and making publicly available the dockets of all these matters is high, as the Clerk's Office will have to review each docket entry and redact for confidentiality and investigative concerns, which likely numbers in the thousands.  Likewise, while technical assistance orders are a smaller category of materials, there will be significant burden in finding these orders because it is not clear the Court has a manner of finding these orders specifically, without reviewing every SCA, PRA, or AWA matter (or criminal miscellaneous case[5]) due to a lack of uniform docketing procedures.  Finally, to the extent Petitioners still seek the Court to make publicly accessible all records in criminal miscellaneous cases filed from 2006 to 2011 that has been unsealed, the burden on the Clerk's Office is high to ensure that the redactions do not harm privacy interests of investigatory targets who were not charged or ongoing investigations.  Indeed, compared to the retrospective relief sought by the *Leopold* petitioners, the retrospective relief sought by Petitioners here is of much broader scope, such that the administrative burden will almost certainly be significantly higher.

Petitioners argue that the Court cannot find that the administrative burden is greater than the common law right of access because the administrative burden is speculative.  (Dkt. No. 49 at 14.)  The Court disagrees.  The Court acknowledges that the parties in *Leopold* had taken on more actions than in the instant case, including releasing limited docket entry information for 2,248 PR/TT matters initiated by the USAO between 2008 and 2016, enumerating the total approximate number of SCA § 2703(d) matters and SCA warrant materials filed between 2008 and 2016, providing 127 redacted pages of four PR/TT matters, and extracting 15 categories of information from 24 PR/TT matters.  *In re Leopold I*, 300 F. Supp. 3d at 73-79.  These actions, however, demonstrate the significant administrative burden that would be required in the instant case as well, especially when the relief sought is, again, greater than what was sought in *Leopold*.

Petitioners also argue that administrative burden is only one factor for the Court to consider.  (Dkt. No. 49 at 14.)  While true, the Ninth Circuit has found that although

---

[5] The Court notes that approximately 19,750 criminal miscellaneous cases were filed between 2006 and 2016.

United States District Court
Northern District of California

United States District Court
Northern District of California

"administrative burden is only one factor for the district court to consider," it acknowledged that "cases could arise in which the administrative burdens of access are so substantial that they justify denial on that basis alone." *Valley Broad. Co.*, 798 F.2d at 1295 n.8.  Such is this case, where the district court would be required to review thousands of miscellaneous cases, determine if the investigations are ongoing, redact private or other identifying information, and file them on ECF. This is not, as the *Leopold* court noted, a "trivial clerical task," but will almost certainly require hundreds of hours of court time that will not be available for other essential court functions.

In finding that the administrative burden overcomes the common law presumption, the Court does not seek to minimize "the important purpose the materials at issue play in judicial proceedings . . . ." *In re Leopold II*, 327 F. Supp. 3d at 24.  The administrative burdens are, however, extremely significant because the relief requested is so broad.  *See id.* at 26-27.  As the Court previously noted in denying Petitioners' motion to unseal, the "request for wholesale unsealing is not practicable, as each case needs to be evaluated on an individual basis to ensure that unsealing is permissible.  Otherwise, there is an undue risk that information which should be sealed, whether because it is required by statute or to protect ongoing investigations or privacy interests, will be improperly released."  (Ord. Denying Mot. to Unseal at 2-3.)  Such review takes time, placing a significant burden on the Court, as well as the Government, which will almost certainly have to be involved in determining whether cases are ongoing and what information needs to be redacted.  Accordingly, the Court concludes that the presumptive common law right of access must give way to the administrative burden that would be imposed on the district court and the Government.

### B.    Prospective Relief

In addition to unsealing and making publicly available the requested documents, Petitioners also request that the Court revise its practices going forward, including that: (1) the Clerk's Office assign case numbers to, docket, and enter into ECF all applications and orders for search warrants, surveillance, and technical assistance; and (2) the Court undertake periodic review of sealed dockets, warrants, surveillance orders, and technical assistance orders, and that the Court unseal records for which there is no longer any need for continued sealing.  (Petition at

24

2.)

Petitioners assert that their prospective relief can be granted per the Court's supervisory power over its own records and files.  (Dkt. No. 27 at 4.)  The Court disagrees.  In general, "[e]very court has supervisory power over its own records and files . . . ."  *Nixon v. Warner Commc'ns*, 435 U.S. 589, 598 (1978).  "A court's 'decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case.'"  *In re Leopold I*, 300 F. Supp. 3d at 107 (quoting *Nixon*, 435 U.S. at 599).  Indeed, most unsealing cases involve a request to unseal filings in a particular case, including nearly all of the cases relied upon by Petitioners.  *E.g.*, *Carlson v. United States*, 837 F.3d 753, 757 (7th Cir. 2016) (requesting the unsealing of transcripts of witness testimony before a grand jury in a 1940s Espionage Act case); *In re Craig*, 131 F.3d 100-01 (2d Cir. 1997) (requesting the unsealing of a transcript of the 1948 grand jury testimony of a specified witness); *In re WP Co. LLC*, 201 F. Supp. 3d 109, 112 (D.D.C. 2016) (requesting the unsealing of search warrant materials relating to an investigation into campaign finance violations during the 2010 District of Columbia mayoral election).

Petitioners here, however, are not asking that the undersigned unseal documents in a specific case assigned to the undersigned.  Instead, Petitioners seek to unseal docket sheets or specific documents in thousands of criminal miscellaneous cases, subject to sealing orders by judges other than the undersigned.  Thus, Petitioners would essentially require that one judge modify or rescind the sealing orders signed by his or her fellow judges.  Such actions would seem to go beyond a court's supervisory power over its own records and files, reaching to the orders and cases of other judges, untethered from the individual facts and circumstances of those cases.

Furthermore, Petitioners also seek prospective relief that would change how the district court handles criminal miscellaneous cases into the future, including revising its docketing and sealing practices.  Again, this goes beyond the sealing practices of an individual judge, but is a structural reform that affects how the court operates.  It is unclear how any one judge can use his or her supervisory power over records and files to effect changes to the court as a whole, or how Petitioners could require that a judge exercise that authority to do so.  Such reform would best be

performed through changes in the applicable Rules Committee or, if necessary, a lawsuit naming a proper defendant.  The Court therefore finds that the supervisory power over records and files cannot be used to carry out structural reforms to the district court as a whole.

That said, the Court does recognize that there are prospective reforms that would be useful to providing the public greater information as to surveillance matters.  *Leopold* is particularly instructive, as the USAO and Clerk's Office entered into a MOU that would change filing, docketing, and unsealing practices of PR/TT, § 2703(d), and SCA warrant materials by requiring standardized formats for case captions for sealed applications and orders.  *In re Leopold I*, 300 F. Supp. 3d at 104.  The standardized information contained no personally identifying information, but would allow the Clerk's Office to periodically generate reports listing the total number, matter docket numbers, and case captions.  *Id.*  Those reports could be unsealed and made publicly accessible without requiring redaction, thus limiting the administrative burden on the Clerk's Office.  The Clerk's Office also adopted new ECF case types to more readily identify the type of criminal investigative matters being filed.  *Id.* at 105.

Notably, the *Leopold* petitioners requested relief similar to the prospective relief sought in the instant case.  First, the *Leopold* petitioners requested that the Clerk's Office provide real-time unsealing and public posting of sealed PR/TT, § 2703(d), and SCA warrant materials, including each matter's case number, case name, date of application, and the assigned magistrate judge.  *In re Leopold I*, 300 F. Supp. 3d at 105.  The district court denied the request, finding that the biannual docket reports about the sealed criminal investigative matters was sufficient to "provide additional transparency as to the processing of these sensitive matters, without jeopardizing either privacy or law enforcement interests."  *Id.* at 106.

Second, the *Leopold* petitioners asked that the district court require that the Government promptly move to unseal the sealed cases upon the close of the related criminal investigation.  *In re Leopold I*, 300 F. Supp. 3d at 106.  If the matter remained sealed within six months after the initial filing, the court was to issue an order to show cause for why the matter should not be unsealed.  The district court found that "adoption of a system that calls for the Court to issue show cause orders in each of the hundreds of PR/TT and SCA matters that are filed each year would be

labor-intensive for the Clerk's Office and would require the USAO to expend resources to review each matter and respond to each show cause order. This is simply unworkable." *Id.* (internal quotation omitted). Rather, the district court found that the periodic reports would provide the "additional transparency regarding the judicial review of sealed criminal investigative matters in a manner that is less burdensome to the Court, the Clerk's Office, and the USAO." *Id.*

Of course, the Court does not suggest that any prospective relief be limited to that allowed in *Leopold*. The Court would encourage Petitioners and the court to come up with creative solutions that would increase transparency without imposing significant administrative burdens on the Clerk's Office and the Government. This petition, however, is not the vehicle for *mandating* such changes, especially under the court's supervisory powers over its own records.

## IV.   CONCLUSION

For the reasons stated above, the Court RECOMMENDS that the petition be denied. In so recommending, the Court recognizes that Petitioners have valid concerns regarding the sealing of documents that no longer need to be sealed. The broad sweep of Petitioners' requested relief, which would impose significant administrative burdens on the district court of reviewing tens of thousands of docket entries and documents and redacting them, requires a recommendation of denial at this point. This is not to suggest that the district court should not work to create new procedures that would address Petitioners' concerns regarding transparency. The instant petition, however, is not the method to obtain such relief.

Any party may file objections to this report and recommendation with the district judge within fourteen days of being served with a copy. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); Civil L.R. 72-3. Failure to file objections within the specified time may waive the right to appeal the district court's order. *IEW Local 595 Trust Funds v. ACS Controls Corp.*, No. C-10-5568-EDL, 2011 WL 1496056, at *3 (N.D. Cal. Apr. 20, 2011).

IT IS SO RECOMMENDED.

Dated: December 18, 2018

_____
KANDIS A. WESTMORE
United States Magistrate Judge

United States District Court
Northern District of California